# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.
LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom E. Phillip
Joshua D. Uller
Kelly A. Welsh

517 East Wisconsin
Suite 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

November 25, 2018

Hon. Pamela Pepper
United States District Court
for Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE: *United States v. Jonathan Lane*
    Case No. 18-CR-121 (PP)

Dear Judge Pepper,

Jonathan Lane is a 28-year-old man with a history of trauma and mental illness. He suffers from PTSD, ADHD, depressive disorder and liver disease, all of which contribute to Jonathan's history of cognitive dysfunction and poor decision-making. Over the years, he's gotten himself in trouble mostly for small-time, nonviolent, nuisance-type crimes. He now finds himself in the most trouble he's ever been in, facing his first federal sentence for tampering with sausage links at his former employer's factory.

In March, Jonathan had been working at the Johnsonville sausage plant for only a couple weeks. He worked on an assembly line, sorting and packing sausage links. It was menial work, but he liked the job. He did, however, get frustrated when they would send him home multiple days in a row upon his arrival without warning. So on a couple occasions, Jonathan decided he would get himself sent home.

Jonathan knew the plant would be forced to shut down if managers were alerted to compromised product, so he devised an ill-conceived plan to make his supervisors think that some of the sausages had been contaminated. On two occasions, Jonathan put an

item into a sausage link and turned it in to management. One time, the object was a piece of cigarette paper; the other, a copper wire connector. Both times he placed the item into a sausage on the line, then took the sausage back off the production line and turned it in to management, claiming to have discovered it. As a result, Johnsonville was forced to shut down production on each occasion, and disposed of thousands of dollars of product for fear of contamination. Jonathan has now accepted responsibility by pleading guilty, and this Court must determine an appropriate sentence.

The facts of this case take it outside the "heartland" of conduct charged under this statute. This is not a case where Jonathan tampered with or diluted medication that went out to patients, nor did he attempt to conceal any contaminated product so that it would go out unnoticed. In fact, Jonathan never intended to let any of the tainted product get out. His sole purpose was to close the plant so he could go home. Had any of the product gone out undetected, it would have been contrary to his plan—he needed the product to be caught so that production would be shut down and he could go home.

These unusual circumstances, along with Jonathan's limitations and mental health treatment needs, warrant a below-guideline sentence. Six months in prison, with a term of supervised release is sufficient to meet the sentencing objectives in this case.

## Background

Throughout his life, Jonathan has faced significant hardships including physical abuse, ADHD, PTSD, depressive disorder, and liver disease. Each of these difficulties has had an impact on Jonathan's judgment and decision-making, and they explain much of his behavior and record. But importantly, Jonathan's conditions are treatable through medication and behavioral therapy, and these treatment needs mitigate against the need for extended incarceration.

Jonathan was born in Sacramento, California and lived there until 2003 when he moved to Plymouth, Wisconsin at 13 years old. Throughout his childhood, Jonathan suffered significant abuse at the hands of his mother and stepfather. This abuse has had lasting effects on his mental health. Jonathan remembers: "Mom used to get upset because I was slower and didn't learn things quick or catch on quick." Jonathan's sister, Nichelle, confirmed the same, recalling that "My mom was abusive to me as well but not as bad as she was to Jonathan."

F̲e̲d̲e̲r̲a̲l̲ D̲e̲f̲e̲n̲d̲e̲r̲ S̲e̲r̲v̲i̲c̲e̲s̲
    O̲f̲ W̲i̲s̲c̲o̲n̲s̲i̲n̲, I̲n̲c̲.

Hon. Pamela Pepper
November 25, 2018
Page 3

Jonathan remembers child services being involved with his family at a young age. One particular incident led to Jonathan being temporarily removed from the home due to visible bruising and marks observed on him. His mother, Patricia Resser, was arrested and put on probation for child abuse. Jonathan was released into his Aunt Donna's care who also lived at the same residence as Patricia. Donna became his legal guardian and custodian, though Jonathan was never actually separated from his mother. After an accident where Jonathan was hit by a car, he remembers that his mother was nicer to him, and the abuse from her receded.

At 13 years old, Jonathan and his family moved to Plymouth, Wisconsin. By this time, Jonathan's relationship with his mother had improved. After Jonathan's accident, she was no longer physically abusing him and he had begun to let go of the past. But while his mother's abuse had ended, Jonathan's stepfather became his abuser.

While living in Sacramento, Jonathan's step father, Jess, was in the military and therefore frequently absent from the home. But after moving to Plymouth, Jess was spending more time in the household and around the family, and Jonathan became the target of his abuse, which included beatings with objects such as hammers and two-by-fours. Shortly after moving to Plymouth, Jonathan recalls being put into foster care for approximately 3 months due to his stepfather's abuse. "They said I could go back home right away if my mom moved out of the house where my step dad was but she wouldn't leave him. So he had to go to anger management and stuff and then I could go back." Jonathan's sister Nikki corroborates as much:

> *"In Wisconsin, the police got called on my step dad a lot for abusing Jonathan. I don't know why he was so mean to Jonathan; he did not like him. One time he spanked Jonathan so bad his ass was black and blue. Another time we got taken out of the house because he gave Jonathan a black eye. I don't know if he punched him or what but the cops took us away and he was taken to jail. We had to wait until my mom got home from work. Jonathan was put into foster care after this." – Nikki Lane*

From this abuse stemmed many life-long psychological consequences, including a PTSD diagnosis and multiple suicide attempts, some of which led to hospitalization. The first incident was at 10 years old. Jonathan was committed to inpatient treatment at Kaiser Permanente Hospital in Sacramento for attempting suicide. Jonathan recalls, "I stood

behind my aunt's car hoping she wouldn't see me so when she left so she would back up and run me over."

Another attempt occurred shortly after his mother died, on December 14, 2015. Jonathan's mother passed away from colon cancer in June of 2015. Up until this point, Jonathan was living in and out of his mother's home but ultimately under her care. During the times he would live on his own and not with her, she often paid his rent and bought him groceries. Once she passed away, Jonathan struggled to find stable living. There were times when his sister, Nikki, allowed him to stay in her home or in her laundry room. He would also stay at the salvation army, at friend's homes, or in his vehicle. On top of the untreated trauma he suffered from years of abuse, the stress of being homeless, poor, and alone while continuously getting in trouble led Jonathan to the brink of hopelessness. He once again admitted himself to the hospital for an attempted suicide and frequent suicidal ideations. He stated he did not have insurance but he knew he needed help. Notes taken by hospital staff at that time were as follows:

> *"Jonathan admitted that he had thoughts of killing himself. Jonathan reported that he had tried hanging himself in the past but a friend tackled him down right when he was about to kick the chair he was standing over. Jonathan reported that he had been having thoughts of suicide since his mother passed a few months ago from cancer. Jonathan reported that he hears her voice almost every day and that it really messes with his head. Jonathan reported that he doesn't have family support because no one wants to deal with him. Jonathan reported that he has been having a bad time finding a place to stay because of his criminal background. Jonathan reported that he had been staying at the salvation army and attempted to overdose on Advil earlier in the day…Patient has recently been homeless. He was staying at friend's houses and at the salvation army but decided to head out on the streets. Patient slept in the sewer last night…Patient told his friends that his life was so bad he wanted to hang himself."*

On top of the trauma, Jonathan suffered from attention deficit hyperactivity disorder. It's uncertain when Jonathan was first diagnosed with ADHD, though at age 15, during his first appointment with Dr. Sharon, it was noted that Jonathan had previously been on multiple different medications for ADHD and behavioral concerns.

Individuals diagnosed with ADHD tend to use their dopamine supply at a faster rate than typical and are exposed to unpleasant feelings when dopamine levels drop. This can

lead to a sense of intolerable boredom. Difficulty tolerating boredom results in difficulty carrying out basic executive functions such as self-regulation, focus, attention, concentration, and impulse control. The bulk of Jonathan's record consists of him getting into mischief when he's "bored." Due to his inconsistent medication schedule, he was often left vulnerable to low stimulation and boredom, eventually leading to sensation-seeking behaviors and stimulating activities that were impulsive and impish.

Nikki recalls her brother getting into a lot of playful mischief when they first moved to Plymouth; playing outside and dumpster diving to find old house appliances that had once been broken to try and make them work again. Jonathan recalls the same type of mischievous behavior, "I got in trouble a lot in Plymouth when I first moved there. I liked to prank people. I used to take people's automatic door bells off their houses and then hide behind a tree and keep pressing the button so the bell would keep ringing and they would have to come to the door." Jonathan explained that a lot of this type of behavior was a result of "boredom."

Jonathan's health has also been complicated by liver disease, which appears to have been exacerbated by his ADHD medications. In May 2006, Jonathan began to see his primary care physician, Dr. Sharon, who prescribed Jonathan Concerta. Over the next three years, between the ages of 15 and 18, Jonathan was stopped and restarted on Concerta and other ADHD medication five times. Jonathan experienced multiple adverse reactions to this medication, some of which went untreated. In 2007 he complained of insomnia, and for that he was prescribed Ambien. In 2010, Jonathan was switched off of Concerta and prescribed Vyvanse. This was due to muscle twitches, or tics, that Jonathan was experiencing as a result of taking Concerta. But the most serious side effect Jonathan experienced was liver function abnormalities.

Notes from 2006 indicate that Jonathan had abnormal liver functions which appeared to be from Concerta. Although it was known that Jonathan was developing liver disease from this particular medication, he was continuously prescribed Concerta for almost five years. His behavioral symptoms were being treated by a medication that was, in the long run, causing him more harm. The abnormal liver tests that Jonathan was receiving indicated that his liver was having difficulty removing chemical enzymes, or toxins, from his blood. This toxin-filled blood goes to Jonathan's brain. Symptoms of liver damage on the brain include, but are not limited to, confusion, difficulty thinking, poor concentration, forgetfulness, and poor judgment. Jonathan exhibited all of these symptoms throughout this time, and when combined with his other limitations, they

created an unhealthy combination of factors which often manifested itself in misconduct, sometimes criminal:



Unstable medication treatment for ADHD, a lack of treatment for PTSD or depressive disorder, and having a dysfunctional liver that is leaking chemical enzymes into the blood leading to the brain—this combination of negative factors has had a significant impact on Jonathan's cognitive functioning and on his ability to make proper decisions, including the conduct he has accepted responsibility for in this case.

## The appropriate sentence

All of the contributing factors to Jonathan's poor judgment and decision-making can be treated, but more effectively so in the community rather than prison. Supervision and the services it provides, including mental health treatment and medication management, will largely meet the sentencing objectives in this case. This is why a sentence of six months in prison with three years of supervised release is appropriate in this case. Community treatment will be more conducive to Jonathan's rehabilitation than will incarceration.

Jonathan knows that he needs medication and has even sought treatment on his own on multiple occasions, whether he has insurance or not. And to his credit, he has not turned to abusing drugs or alcohol to self-medicate or cope.

He has shown through his work history that he can be a productive member of the community. He has been working or actively seeking employment since the age of 15. From 15 to 18 years old, Jonathan worked at Gino's pizza in Plymouth, delivery driving and doing other miscellaneous work. He is mechanically inclined and likes to work on cars. During periods of unemployment, he would do side jobs for family and friends, fixing vehicles and performing other general labor tasks as needed.

Jonathan started working at Taco Bell in April of 2017. He worked throughout all three locations in the Plymouth and Sheboygan area for about ten months. Jonathan's general manager, Kristina Gubitose, reported that he was a good worker:

> *"Jonathan was one of the only employees that came in when I needed him to. He would work open to close if I asked him to. He helped with the machines when they went down and 99% of the time he could fix it himself so I didn't have to wait to the mechanic or anything to come fix them. He was such an amazing employee… He wouldn't even let us girls light the fryers; he would do it because he didn't want anyone getting hurt in case something happened. He would say, "no you guys got kids and stuff to look after so just let me do it". He left to get better paying employment, I was sad when he left and told him he could come back and work here whenever he wanted to." – Kristina Gubitose, Taco Bell manager*

After being fired from Johnsonville, Jonathan found a job working for Amerequip Corporation at their farm equipment supplier headquarters. Jonathan was working on a team building John Deere tractors, and was receiving great feedback from his supervisors. He particularly enjoyed this job because he had a passion for working on vehicles. Unfortunately, Jonathan was terminated due to missing work after his arrest for this case. However, he's been told that he has a job waiting for him there upon his release, and he plans to go back.

Jonathan also is anxious to get back to work so that he can start earning again to support his family. He has a good relationship with his children's mothers and sees his kids as much as he can. He wants to be able to support them financially. Jonathan also wants to give back to his sister for all of the times she has helped him.

Jonathan has a very close relationship with his sister Nikki. She has let him stay with her on multiple occasions when Jonathan was homeless and has helped him get jobs. Since their mother's passing, Nikki has felt a responsibility for Jonathan. She has contact with him almost daily and takes care of his truck while he is incarcerated. Nikki is concerned about Jonathan's mental health. She describes Jonathan as mischievous but loving; as someone who has loses his way occasionally but would never hurt anyone. Nikki will continue to be a source of support for Jonathan upon his release.

Six months in prison is sufficient for the conduct Jonathan has accepted responsibility for. On top of prison, the restitution is substantial, and more prison will keep him from working to pay off his debts. He also has child support obligations, which have been accruing even while Jonathan remains in custody.

Jonathan is not a dangerous person, and he does not have a history of violence. As discussed above, Jonathan had no intention of letting any tainted product ever get to a consumer, though he understands that his actions may have created such a risk. Nonetheless, these are mitigating circumstances that the guidelines don't account for. The facts of this case make it more akin to a violation of § 1365(b), which requires an intent to harm a business, not a person.[1] But in any event, § 3553(a)'s parsimony principle compels the least prison necessary to punish Jonathan for his conduct. Time beyond six months is unnecessary, and would be counterproductive to his rehabilitation and ability to start paying back restitution. Jonathan's successful reintegration into the community is the ultimate public safety goal, and supervision and treatment, not more prison, will help facilitate that end.

For all of these reason, we ask the Court to adopt our recommendation and impose a sentence of six months in prison with a three-year term of supervised release.

Sincerely,

*s/Ronnie V. Murray*
Ronnie V. Murray

RVM/lc

---

[1] If the court considered those guidelines, he'd be at offense level 12 (§2N1.3), down to 10 after acceptance, at CHC VI, with a recommended sentence range of 24-30 months—a fraction of what the government is recommending.